**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

ORLANDO OLIVENCIA DE JESUS,
JOSE MARCELO. RIVERA RAMIREZ                    Civ. Num.

Plaintiffs

                                      Re:    Civil Rights Violations

vs.                                             Preliminary Injunction
                                                Declaratory Judgment

THE PUERTO RICO ELECTRIC POWER AUTHORITY
 JORGE F. HERNANDEZ PEREZ, ZORAIDA FUENTES        **PLAINTIFFS DEMAND**
 MOURE and their conjugal partnership, in his personal   **TRIAL BY JURY**
And Official capacities, JUAN ALICEA FLORES, JANE
DOE and their conjugal partnership in his personal
And official capacities, VICTOR M. OPPENHEIMER
SOTO, SUSAN ROE, and their conjugal partnership, in his
personal and official capacities, MARIA M. MENDEZ RIVERA,
JOHN ROE, and their conjugal partnership, in her
personal and official capacities MANUEL PEREZ SOLER,
MARIA TERESA ADAMES AQUINO, and their
conjugal partnership, ANGEL FIGUEROA JARAMILLO,
SUSAN ROE and the conjugal partnership formed by
them, JOHN AND JANE ROE and their conjugal
partnership, INSURANCE COMPANIES A, B, and C

Defendants

---

**COMPLAINT**

**TO THE HONORABLE COURT:**

COME NOW plaintiffs Orlando Olivencia de Jesus, Jose Marcelo Rivera Ramirez,

through their undersigned counsel, and respectfully ALLEGE and PRAY as follows:

    I.    JURISDICTION

    1.  This suit is brought and jurisdiction lies pursuant to 42 U.S.C. §§ 1983, 1988, as

       amended, and the First, Fifth and Fourteenth Amendments of the United States

1

Constitution.

2. This Honorable Court has jurisdiction over plaintiff's federal claims under 28 U.S.C. 1331 and 1343. Its jurisdiction over state law claims is invoked pursuant to the doctrine of pendent or supplemental jurisdiction. 28 U.S.C. 1367. The following local laws are invoked: the Due Process Clause of the Puerto Rico Constitution, Section 4 of the Puerto Rico Constitution, Article 1802 of the Puerto Rico Civil Code, and 32 L.P.R.A. § 3115.

3. The proper venue for this case lies in this Court, as the defendants all reside in Puerto Rico and the causes of action took place here. 28 U.S.C. 1391(b). All of Jorge F. Hernandez Perez's actions have been taken under color of law, and the remaining defendants conspired with Mr. Hernandez Perez to deprive plaintiffs of their civil rights.

4. In order for this Court to grant a preliminary injunction, plaintiffs must show irreparable harm, the likelihood of prevailing on the merits, that the balance of the equities weighs in their favor, and that the public interest will be served by the issuance of the injunction. *Winter v. Nat. Res. Def. Council,* 555 U.S. 7, 20 (2008).

5. Mr. Hernandez Perez's actions in conspiring with the remaining defendants to initiate and maintain the baseless decisions to suspend and then dismiss plaintiffs without grounds have caused and are causing plaintiffs significant and irreparable harm.

6. The harm includes emotional distress, and severe harm to the reputation of

2

these workers, whose only "sin" was to belong to the New Progressive Party and , in Mr. Olivencia's case. to refuse to cooperate with defendants' scheme to remove NPP supervisors so that defendants could replace those supervisors with people from the Popular Democratic Party.

7. Plaintiffs are without the medical insurance to which they are entitled per the Collective Bargaining Agreement due to defendants' unconstitutional condition and risk suffering irreparable harm without it..

8. Lamentably, the law regarding the dismissal of career employees to replace them with political hacks is well developed due to the tradition of such dismissals in this district. *See eg., Branti v. Finkel,* 445 U.S. 507, 518 (1980); *Martinez Velez v. Rey Hernandez,* 506 F.3d 32, 39 (1st Cir. 2007); *Jimenez Fuentes v. Gatzimbide,* 807 F.2d 236 (1st Cir. 1986).

9. PREPA, acting through Mr. Alicea Flores, Mr. Oppenheimer Soto, Mr. Hernandez Perez, and Ms. Mendez in conspiracy with UTIER leadership, dismissed plaintiffs, even though plaintiffs had not violated PREPA's rules, with untimely charges due to their political affiliation and to pressure Mr. Olivencia to commit perjury against their supervisor.[Apparently, since Mr. Rivera was more active politically than Mr. Olivencia, defendants did not even ask him to provide false statements against his supervisors.]

10. Plaintiffs are likely to prevail in this litigation. *Winter v. Nat. Res. Def. Council,* 555 U.S. at 20. Defendants violated the Collective Bargaining Agreement by filing the charges late, they violated an arbitrator's decision that security guards

are not competent to determine attendance, and in Mr. Rivera's case, they have
dismissed him without ever filing formal charges against him, much less filing
these trumped up charges within the five working days that the CBA requires.

11. The public interest favors this preliminary injunction to reinstate plaintiffs to their
positions, particularly given the pattern of unconstitutional behavior by Puerto
Rico government officials.

12. This Court has even seen this particular *modus operandi* of threatening to
discipline an employee at PREPA for his refusal to provide false testimony
against another employee so that PREPA could dismiss the other employee
baselessly. *Cardona Perez v. PREPA,* 08-1425 (JAF).

13. Miguel Cordero, PREPA's former executive director admitted publicly that
PREPA fabricated cases against employees because of their political ideology.

II. PARTIES

14. Plaintiff, Orlando Olivencia is of legal age, a United States citizen, single, and a
resident of Puerto Rico. At all times relevant to the instant Complaint, plaintiff
was an individual protected by the laws invoked in this Complaint. Mr. Olivencia
is a member of the New Progressive Party.

15. Plaintiff, Jose M. Rivera Ramirez is of legal age, a United States citizen, single,
and a resident of Puerto Rico. At all times relevant to the instant Complaint,
plaintiff was an individual protected by the laws invoked in this Complaint. Mr.
Ramirez is a member of the New Progressive Party.

16. Defendant, the Puerto Rico Electric Power Authority is sued for injunctive relief

4

only, not money damages.

17. Defendant Juan Alicea Flores is sued in his official and personal capacities for conspiring with the remaining co-defendants to violate plaintiffs' rights to due process under the Fifth and Fourteenth Amendments, Mr. Olivencia's First Amendment right not be to coerced into making false statements, and Mr. Rivera and Mr. Olivencia's First Amendment rights to belong to the political party of their conscience, all of which resulted in plaintiffs being suspended with and then without pay . In conspiracy with the other defendants, Mr. Alicea Flores also violated plaintiffs' rights under the Puerto Rico Constitution. Mr.Alicea is a member of the Popular Democratic Party.

18. Defendant Victor Oppenheimer Soto, Esq. is sued in his official and personal capacities for conspiring with co defendants Juan Alicea Flores, Jorge Hernandez Perez, Manuel Perez Soler, Maria Mendez Rivera, Esq., and Angel Figueroa Jaramillo to violate plaintiffs' rights to due process under the Fifth and Fourteenth Amendments, Mr. Olivencia's First Amendment right not be to coerced into making false statements, and Mr. Rivera and Mr. Olivencia's First Amendment rights to belong to the political party of their conscience, all of which resulted in plaintiffs being suspended with and then without pay. In conspiracy with the other defendants, Mr. Oppenheimer also violated plaintiffs' rights under the Puerto Rico Constitution. Mr. Oppenheimer Soto is a leader of the PREPA organization Energia Popular, a political partisan group of the PDP.

19. Defendant Maria Mendez, Esq. is sued in her official and personal capacities

5

for conspiring with co defendants Juan Alicea Flores, Jorge Hernandez Perez,

Victor Oppenheimer Soto, Esq., Manuel Perez Soler, and Angel Figueroa

Jaramillo to violate plaintiffs' rights to due process under the Fifth and

Fourteenth Amendments, Mr. Olivencia's First Amendment right not be to

coerced into making false statements, and Mr. Rivera and Mr. Olivencia's First

Amendment rights to belong to the political party of their conscience, all of

which resulted in plaintiffs being suspended with and then without pay. In

conspiracy with the other defendants, Ms. Mendez also violated plaintiffs' rights

under the Puerto Rico Constitution and defamed them on the radio program

Noti Uno. On information and belief, John Roe is Ms. Mendez's husband, with

whom she forms a conjugal partnership. Maria Mendez, Esq., is a member of

the Popular Democratic Party, is the secretary of the PREPA Board of Director

at the same time is the PREPA Human Resource Director and according to a

October 15, 2013 Vocero newspaper article, in the past Ms. Mendez received a

complaint from Government Ethics Office when she was the PREPA Legal

Consultant but  she received a retroactive waiver from 1999 until 2003. Ms.

Mendez Rivera had violated the law in 2005 (case number 06-80) for the same

thing. Ms. Mendez did not request a waiver to the State Department even

though her husband had contracts with the Government Development Bank

(GDB) and the Courts Administration. For this ethical violation Rivera Mendez

paid a fine of $ 2,000. The newspaper's source said that Ms Mendez Rivera is

the primary liaison between Fortress and PREPA and exerts an important role

in giving the nod to renewable energy projects within the corporation.

20. Defendant Jorge F. Hernandez Perez is sued in his official and personal capacities for conspiring with co defendants Juan Alicea Flores, Victor Oppenheimer Soto, Esq., Manuel Perez Soler, Maria Mendez, Esq., and Angel Figueroa Jaramillo to violate plaintiffs' rights to due process under the Fifth and Fourteenth Amendments, Mr. Olivencia's First Amendment right not be to coerced into making false statements, and Mr. Rivera and Mr. Olivencia's First Amendment rights to belong to the political party of their conscience, all of which resulted in plaintiffs being suspended with pay and then without pay. In conspiracy with the other defendants, Mr. Oppenheimer also violated plaintiffs' rights under the Puerto Rico Constitution. On information and belief, Zoraida Fuentes Moure is Mr. Hernandez Perez's wife, and the two of them form a conjugal partnership.

21. Defendant Manuel Perez Soler is sued for conspiring with co-defendants Alicea, Oppenheimer, Mendez, Hernandez Perez and Figueroa Jaramillo to violate plaintiffs' rights to due process under the Fifth and Fourteenth Amendments, Mr. Olivencia's First Amendment rights not to be coerced into making false statements, and Mr. Rivera and Mr. Olivencia's First Amendment rights to belong to the political party of their conscience, all of which resulted in plaintiffs being suspended without pay and then dismissed. On information and belief, Maria T. Adames Aquino is Mr. Perez's wife, and the two of them form a conjugal partnership. Mr. Perez Soler also violated plaintiffs' rights under the

7

Puerto Rico Constitution. Mr. Perez was a Popular Democratic Party city council member in the prior administration of Isabela's Mayor Carlos Delgado.

22. Defendant Angel Figueroa Jaramillo is sued for conspiring with co-defendants Alicea, Mendez, Oppenheimer Soto, Hernandez Perez and Perez Soler to violate plaintiffs' rights to due process under the Fifth and Fourteenth Amendments, Mr. Olivencia's First Amendment rights not to be coerced into making false statements, and Mr. Rivera and Mr. Olivencia's First Amendment rights to belong to the political party of their conscience, all of which resulted in plaintiffs being suspended with and then without pay.  On information and belief, Susan Roe is Mr. Figueroa Jaramillo's wife, and the two of them form a conjugal partnership. Mr. Figueroa Jaramillo also violated plaintiffs' rights under the Puerto Rico Constitution.

23. Defendant Insurance Companies A, B, and C are one or more insurance companies that may have issued and have in effect policies of insurance for the risks that result from the acts stated in this Complaint, the identity of which are unknown at present.

24. Defendants John Doe, Jane Doe, John Roe and Jane Roe, and their respective conjugal partnerships, are persons responsible for the acts and damages alleged in the instant case whose identities are unknown at this moment.

II.    FACTS

25. Mr. Olivencia began to work for the Puerto Rico Electric Power Authority in January 2001 as lineman, after having been trained for almost a year by a

8

private company John Dewey College, under a plan initiated in the
administration of Governor Pedro Rosello.

26. Mr. Rivera began to work for the Puerto Rico Electric Power Authority in
January   2001 as a lineman, after having been trained for almost a year by a
private company John Dewey College, under a plan initiated in the
administration of Governor Pedro Roselló.

27. Virtually all of the employees trained at John Dewey College, under the Roselló
initiative were members of the New Progressive Party. Members of Puerto
Rico's other political parties viewed the initiative as part of Governor Roselló's
initiative of privatization.

28. Both Mr. Olivencia and Mr. Rivera are party activists, identified publicly at
PREPA with the New Progressive Party, and belong to a pro-statehood group of
PREPA known as the Energeticos del NPP.

29. The vast majority of PREPA's employees belong either to the Energeticos del
NPP or to Energia Popular, the Popular Democratic Party organization of
PREPA employees.

30. Who belonged to each political partisan group was common knowledge at
PREPA.

31. Mr. Rivera served as Vice President of the Energeticos del NPP of the northern
area of Puerto Rico and had started a campaign to run for President of that
group.

32. Mr. Olivencia has worked as a NPP poll watcher during elections in several

times.

33. Mr. Rivera has worked as a NPP poll watcher during elections since he was old enough to vote.

34. Mr. Rivera was considered as a candidate for Representative District 16 in a NPP primary to be a Representative from San Sebastian, Isabela and Las Marias which was reported in the El Nuevo Dia newspaper on December 12, 2010.

35. The Nuevo Dia article identified Mr. Rivera as a PREPA employee.

36. PREPA employees' time records are recorded by their sign in/sign out sheets at the job.

37. In a Arbitration decision there is a ruling on the access control system where PREPA agreed with UTER not use the access control system to discipline employees or dock them for time allegedly not worked

38. The records of security guards are unreliable because employees do not always arrive to work in their cars; they may be dropped off by a family member, etc.

39. In particular, the records kept by the security guards at the PREPA location in Isabela were unreliable.

40. PREPA supervisors met with the private security company in July 2013 to discuss the discrepancies between the information reported by the guards and the facts. As a result of that meeting, the security guards acknowledged their errors and agreed to improve their recordkeeping in the future.

41. The collective bargaining agreement between the Union de Trabajadores de la

Industria Electrica y Riego (UTIER) and PREPA provides that any disciplinary action for misconduct must be brought within 30 working days of the misconduct.

42. On August 19, 2013, when plaintiffs arrived at work, Laurentino Nieves Esteves, a supervisor of client service in the Isabela commercial office, and Luis Velazquez, from security escorted them and about a dozen other PREPA employees to an empty office on the second floor.

43. Oscar Colon, who is in a wheelchair, could not go up to the second floor, Mairis Gomez Cruz, who was at a medical appointment, and Madeline Babilonia, who worked as a cashier, were all on the list, but they did not go up to the second floor.

44. Mr. Rivera had not wanted to leave Mr. Colon alone, but the Supervisor Laurentino Nieves told Mr. Rivera that he had to go to the second floor office with the other employees and leave Mr. Colon downstairs alone.

45. There was no written policy about how to handle the situation with Mr. Colon, and in the absence of a union delegate, Mr. Rivera had to leave Mr. Colon alone.

46. Mr. Olivencia had already learned that the supervisors Jose Torres Perez and Nydia Soto Quiñones, both members of the New Progressive Party, had been fired.

47. The vast majority of the PREPA employees on the list to be fired were known members of the New Progressive Party.

11

48. While he waited in the second floor office for his name to be called, Mr. Olivencia called at 9:48am Mr. Perez Soler, the union steward, to ask him to come to represent him and the other union employees and asked him what to do about the letters they had been told that they were to receive.

49. Mr. Perez Soler responded that he had heard something about the dismissals.

50. Even though UTIER had the obligation to send a representative under such circumstances, after Mr. Olivencia repeated his question, Mr. Perez Soler told Mr. Olivencia to accept the letter, and that the union would handle the situation later.

51. On information and belief, Mr. Perez Soler already knew the scheme that Mr. Hernandez Perez had concocted with the other defendants to dismiss plaintiffs' supervisors based on fabricated charges from subordinates fearful of losing their own jobs.

52. Mr. Luis Velazquez began calling the employees on the list one by one.

53. When Mr. Velazquez called Mr. Rivera, he went down to a room where co-defendant Hernandez Perez was with a supervisor named Manuel Perez Nieves, and Mr. Hernandez handed him a letter and told him to read the letter outside.

54. The letter stated that a Mr. Soto not Mr. Rivera was suspended and that he would been given an informal hearing.

55. After various other employees were called, Mr. Velazquez called Mr. Olivencia. Present in the office were Hernandez Perez, the supervisor Manuel Perez

Nieves, Anicet Ruiz Nieves, the security officer for the corporate area, and Mr. Velazquez, the security chief from Bayamon,

56. The letters to both plaintiffs [Mr. Rivera's incorrectly addressed to a Mr. Soto] stated that plaintiffs had been repeatedly late, had misused PREPA property, had falsified documents, had limited PREPA's production, and had abandoned their employment.

57. Plaintiffs collected their personal belongings and left the PREPA offices.

58. The next Mr. Olivencia heard was a voice mail from the son of Isabela's mayor, Carlos Delgado, who is a PREPA employee, telling him that there would be a meeting with UTIER at 5:00 p.m.  Mr. Delgado's father is a Popular Democratic mayor and used to be the Vice President of the Popular Party.

59. The day of the dismissals, Carlos Delgado was in San Juan taking an exam to become a management employee.

60. Mr. Rivera was also told to attend the UTIER meeting.

61. Mr. Olivencia then got Angel Figueroa Jaramillo's phone number and tried calling him twice.

62. Shortly after 1:00 p.m., Mr. Olivencia texted Angel Figueroa Jaramillo and asked him to call him before a meeting set for 5:00 pm. because Ms.  Nydia Soto told him that she had documents that could get the charges dismissed against everyone who was suspended that very day.

63. Ms.  Nydia Soto had a copy of an e mail from July 2013 that demonstrated that management had been dissatisfied with the recordkeeping of the security

13

guards because they noted times incorrectly and failed to note the entry and exit of certain cars.

64. In the e mail, management confirmed that the security guards were to rectify the recordkeeping errors going forward.

65. All of the allegations against the PREPA workers who were suspended from duty on August 19, 2013 involved recordkeeping from before July 2013.

66. In the days before August 19, PREPA supervisors from the Popular party altered records regarding union workers from the Popular party so that it would appear that they had arrived on time, when they had been late according to the guard's logbook.

67. Mr. Figueroa Jaramillo refused to even look at the evidence Ms. Soto had and said that he did not want her at the meeting.

68. At the meeting at the UTIER in Camuy, Mr. Figueroa Jaramillo said that he had known that the dismissals were going to occur for the last two or three weeks, and that in all the time he had been in the union, he had never seen so many employees dismissed from one regional office at a time.

69. Mr. Figueroa Jaramillo also told the suspended workers that the union would not be getting them lawyers for their informal hearings and that they should not hire their own attorneys because in his experience private lawyers only ruined cases; that no one should speak at the informal hearings; and that they should wait for the formal hearings, but that the formal hearings could take years to be scheduled.

14

70. Mr. Olivencia said that he imagined that the UTIER would be holding a general strike the next day to protest this mass dismissal without cause.

71. Mr. Figueroa Jaramillo responded that the whole matter had to be settled quickly, before the press learned of it because PREPA's image had suffered a lot of late; he told them that they could be facing criminal charges because they had been accused of stealing time from PREPA, and he instructed all of those present at the meeting not to talk about what had happened with anybody, particularly the media.

72. Mr. Figueroa Jaramillo further warned the union workers that if criminal charges were filed, UTIER could not defend them.

73. Mr. Figueroa Jaramillo said that he was going to meet with Victor Oppenheimer, Esq., the director of PREPA's legal division, and that he would have to accept whatever Mr. Oppenheimer was willing to offer.

74. Mr. Figueroa Jaramillo also told all the union members at the meeting that for less serious accusations than the charges against them, "El Buho" Marrero had gone to prison. [Senator Marrero was convicted of misappropriating $600.00)

75. Someone at the meeting asked Mr. Figueroa Jaramillo what would happen with their medical insurance, and he said he did not know, that he would try to keep their insurance in place until their formal hearings, but that he could not guarantee that.

76. Mr. Figueroa Jaramillo also told all the union members that if they had any money in their pension plans, that they should take it out quickly because if they

15

left it in, it would be more difficult to withdraw later.

77. Mr. Rivera told Mr. Figueroa Jaramillo that the suspension was obviously political because Mr. Hernandez had not suspended Popular employees who had also left the parking area before the end of the workday according to the guard's logbook since they performed the same jobs at the same time as employees who had been dismissed.

78. When Mr. Rivera said this, Mr. Figueroa Jaramillo got angry and said that everyone knew that he [Mr. Figueroa] was a member of the pro Independence party, and that he was not going to talk about politics.

79. Even though Mr. Figueroa Jaramillo knew or should have known that the suspensions were invalid because they were untimely and violated the Collective Bargain Agreement and the existing arbitrator's decision, he mocked Mr. Rivera for saying the suspensions were politically motivated, he said angrily to Mr. Rivera That he could not add more people to the bucket because it was too heavy already and if he kept adding weight he was not going to be able to lift it. [Meaning that the union should not be concerned about the dismissals without just cause of plaintiffs' NPP supervisors.]

80. Mr. Figueroa Jaramillo said that he had a meeting scheduled with Mr. Oppenheimer the next day at 7:30 am, and that he was going to accept whatever offer Mr. Oppenheimer made.

81. On August 20, 2013 at around 2:30p.m., plaintiffs learned that PREPA had reinstated Mairis Gomez because payroll had overlooked certain things, so they

closed her case. Ms. Gomez was suspended with the other NPP workers on

August 19, but PREPA has never revoked her suspension in writing.

82. Ms Gomez also told Mr. Rivera that Mr. Colon and Jorge Lasalle had also been

told that they could return to work the next day.

83. At 4:01pm Mr. Rivera received a phone call from Mr. Perez Soler, who told him

Mr. Oppenheimer refused to offer a settlement for Mr. Rivera. Mr. Rivera

responded that he still wanted to attend the meeting to learn what the union

would do for him, and Mr. Perez Soler told him that he should not go to the

meeting so that Mr. Perez would not have to admit in front of everyone else that

he had gotten a settlement for everyone else, but not for Mr. Rivera supposedly

because Mr. Perez did not want Mr. Rivera to be embarrassed in front of his

colleagues.

84. At around 4:30p.m., plaintiffs received text messages stating that there would

be a meeting at 6:30 that evening in the UTIER offices in Camuy.

85. So Mr. Rivera did not go to the meeting. Mr. Perez Soler began the meeting by

telling everyone present that the only person whose case was not being settled

was Mr. Rivera, because Mr. Oppenheimer did not want to settle with Mr. Rivera

because of the supposed gravity of his misconduct and that the others should

not miss the chance to settle.

86. Mr. Perez Soler then told the suspended workers that he had seen the evidence

against them, and it was bad.

87. Mr. Perez Soler then told each of the suspended workers what each had to say

17

in a sworn statement to procure the dismissals of their NPP supervisors, saying

that this is what he had negotiated with Mr. Oppenheimer as a condition of their

returning to work.

88. Mr. Perez Soler told the janitor, Jorge Lasalle, that he would have to swear that

he left before 5:00 p.m., bought cleaning supplies with his own money, and

through an agreement with management, was compensated with time off.

89. Mr. Perez Soler told Juan A Morales, Carlos Lugo, and Rafael Velez that they

had to say that they had an agreement with management to use an official

PREPA vehicle as a means of transportation to travel back and forth from

Quebradillas to Isabela.

90. Mr. Perez Soler told Mr. Olivencia that Victor Oppenheimer said that he had to

accept 40 hours of suspension and that he did not have to give testimony

against anyone.

91. Mr. Olivencia refused, saying that the guards' annotations of attendance were

inaccurate, that he had evidence to demonstrate that he had not been tardy or

left work early on the days in question, and that PREPA had already admitted

that it had made mistakes in the cases of other employees.

92. Mr. Perez Soler  responded, angrily, that maybe Mr. Olivencia could show that

two or three of the days were mistakes, but not  all of them.

93. Nonetheless, Mr. Perez Soler had told Jerry Soto that if he showed one date of

late arrivals was incorrect, then the entire case against him would fall.

94. Mr. Olivencia then asked Mr. Perez Soler what would happen if he accepted the

18

agreement, including the 40 hours of suspension, and then the next day the
security guard put down his arrival time at 8:40 a.m., when he had arrived at
8:30 a.m.

95. Mr. Perez Soler told Mr. Olivencia that if that happened, he and the manager
would be fired again.

96. Mr. Olivencia then left the office, and a few minutes later, Juan A Morales came
out and told Mr. Olivencia that he should not complain because Mr. Perez Soler
told him that he had to argue with Mr. Oppenheimer to include Mr. Olivencia in
the agreement, since Oppenheimer wanted to exclude both Mr. Rivera and Mr.
Olivencia.

97. Mr. Olivencia then returned to the office and watched and listened while Mr.
Perez Soler discussed the conditions to be place on all the employees in order
for them to return to work as Mr. Perez Soler consulted on the phone with Mr.
Oppenheimer.

98. Mr. Olivencia left the office around 8:15 p.m. and later called Mr. Soto, saying
that he could not accept the agreement because he would be admitting that he
had stolen from PREPA, when he never stole anything.

99. Mr. Soto said that he understood, but that he had a mortgage payment and a
new baby, and he could not afford to be unemployed, so he was considering the
offer.

100. The next morning, Mr. Olivencia called Mr. Rivera and told him that Mr. Perez
Soler had told everyone that Mr. Rivera's case would not be settled because it

was so bad.

101. Mr. Lasalle then called Mr. Olivencia to ask if he wanted to speak with the mayor of Isabela about their suspensions. Mr. Olivencia rejected the offer.

102. UTIER had called for a about a 60minute strike to protest the suspensions, so Mr. Rivera stopped to greet his colleagues who were participating in the strike at the San Sebastian Transmission Office. Those colleagues then told Mr. Rivera that they did not understand the work stoppage for "Mr. Rivera having been paid to go to the University during working hours." Mr. Rivera did not know where his colleagues had gotten this false information.

103. Mr. Rivera then met with Mr. Perez Soler and told him that he was studying at night, Mondays and Wednesdays from 8:30 pm to 10:30 pm and Saturdays from 8:00 am to noon and 2:00 pm to 6:00 pm, and that he could prove it.

104. Mr. Perez Soler told him that if he could show him proof he was not going to the university during working hours that he would get Mr. Rivera's suspension revoked.

105. Mr. Rivera brought Mr. Perez Soler the evidence, and Mr. Perez Soler did nothing with it.

106. When he entered his informal hearing, Mr. Rivera had the evidence of his matriculation in night school in hand.

107. Mr. Perez Soler instructed Mr. Rivera not to testify, knowing ahead of time that there would be no settlement of Mr. Rivera's case for Mr. Rivera to return to work.

20

108. If Mr. Perez Soler had allowed Mr. Rivera to present his evidence, he could have gone back to work, except Mr. Perez Soler refused to do that because Mr. Oppenheimer had already decided that Mr. Rivera would not return to work and that everyone would be told that Mr. Rivera had been attending school during work hours. Mr. Perez Soler told anyone who would listen that Victor Oppenheimer was saying "off the record" that Mr. Rivera had been fired because he was studying during working hours.

109. That afternoon Mr. Hernandez suspended Mr. Rivera without pay and took his medical insurance card.

110. Then Mr. Perez Soler told Mr. Rivera and the other suspended PREPA workers to wait because there cases were being negotiated at the Governor's mansion. [Fortaleza.]

111. The suspended employees were being given their informal hearings, and Mr. Perez Soler came up to Mr. Olivencia and told him that no one was going to testify. Mr. Olivencia responded that he wanted to testify because he had not missed work when PREPA claimed he had.

112. Mr. Perez Soler responded that it went badly for union members who testified in informal hearings.

113. When it came time for Mr. Olivencia's hearing, he answered the basic questions as to his name and address, but when the questions about his alleged misconduct came, Mr. Perez Soler wrote on his notebook that Mr. Olivencia should state that he invoked his right not to testify.

114. Based on Mr. Olivencia's failure to put on evidence in his defense, and the security guards' invalid statements as to his attendance, PREPA suspended him without pay and removed the cards of his family medical insurance.

115. After the informal hearings ended, Mr. Perez Soler first told all the union employees to turn in their medical insurance cards, which they did, delivering them to Mr. Hernandez Perez, and then Mr. Perez Soler told everyone to go directly to the UTIER headquarters in Camuy.

116. Mr. Olivencia stopped and ate, but the other employees had been waiting without eating, and Mr. Perez Soler said he would order pizzas. Mr. Olivencia took out $5.00 to contribute, but Mr. Perez Soler said that UTIER would pay for the pizzas.

117. While they waited for the pizza, Mr. Perez Soler told them that the terms of the agreement with PREPA had changed. Everyone would have to testify against management, accept the misconduct alleged, some had to return the money "stolen" [by having been tardy], and some had to accept a probation for a year.

118. Mr. Olivencia asked why the day before he had been offered by Mr. Oppenheimer the chance to return to work in exchange for a 40 hour suspension, and Mr. Perez Soler answered that Maria Mendez, Esq. had changed all the agreements because PREPA Executive Director Juan Alicea Flores had not yet approved the agreements.

119. Mr. Perez Soler told them that Attorney Mendez wants all the employees to testify against management and if you want to go back to work, you have to

22

accept what she says.

120. Mr. Olivencia responded that he did not have many financial obligations, so he did not have accept Attorney Mendez's terms, and Mr. Perez told him that's your decision, but remember that even if you win, you will probably be out of work for five years.

121. Mr. Olivencia said he did not care, and Mr. Perez Soler got angry.

122. Mr. Perez then told Mr.Lasalle that he would not be suspended, but that he would have to testify against Nydia Soto. Mr. Lasalle answered that he preferred a suspension of 500 hours and not to testify against Ms. Soto. Mr. Perez replied that if Mr. Lasalle wanted to return to work, he had to testify against Ms. Soto.

123. Mr. Lasalle began saying that his dignity was all that mattered, and that he did not agree with the proposal. Mr. Olivencia said that he had evidence that would exonerate everybody, that no one should sign, and left the room. Mr. Perez Soler then told everyone else not to pay any attention to Mr. Olivencia because Mr. Olivencia was crazy, that he thought that he could save the workers with one piece of paper, that he could rebut one or two of the dates, but not all of them. Of course, Mr. Olivencia had Ms. Soto's e mail which would have exonerated everyone because it demonstrated that the guards' entries as to arrival and departure time were untrustworthy.

124. Mr. Perez took Mr. Lasalle and then Mr. Morales and Mr. Carlos Lugo to the room, and then they came out, the last two saying that each person had to save himself. [La salvacion es individual.] , and Mr. Lasalle as calm as a lamb after

he had been so angry about his dignity just minutes before.

125. Another of the suspended workers, William Quiñones said that the self same Jorge Hernandez Perez had authorized him to work Sunday with a side agreement, and now Mr. Hernandez Perez wanted to fire the NPP supervisors for having side agreements. Mr. Hernandez Perez is a member of the Popular Democratic Party.

126. The suspended worker Angel Alicea mentioned that he worked Saturdays in Quebradillas, and Regional Administrator's assistant authorized them to work through lunch to leave early. The Regional Administrator is Alfonso Villafañe, who is also a member of the Popular Democratic Party.

127. The testimony that defendants sought to implicate supervisors only involved NPP supervisors.

128. Meanwhile, Mr. Perez was talking with some of the suspended workers one by one in another office. As each worker left the office, he had stopped complaining and agreed to testify against management.

129. The suspended workers were anxious, hungry, suffering, fatigued mentally, with their spouses calling, unduly pressured by Mr. Perez's tactics, which were particularly ironic for a union official to tout each man for himself.

130. Mr. Perez said that they were waiting for call from Mr. Oppenheimer, who called at about 8:00 pm.

131. Mr. Perez wrote on a yellow pad as Mr. Oppenheimer dictated, "They can be referred to the government ethics office; to Justice, to the Comptroller." The

24

suspended workers all looked scared at what they were hearing.

132. Even though Mr. Perez knew that the workers should have been allowed to keep their medical insurance, he told them they would lose it in order to pressure them to agree.

133. Mr. Perez told Mr. Oppenheimer that he was going to discuss the agreement with everyone and that he would call back briefly.

134. Mr. Perez then said to the group, "Boys, that's all there is. Do you agree? Will you testify?" Some of the group said yes, but there was no vote.

135. Mr. Perez called Mr. Oppenheimer and told him that everyone was going to plead guilty and testify.

136. Of course, Mr. Perez had made it clear to Mr. Rivera that there was no settlement because of how "ugly" his case was.

137. Mr. Rivera stood up and congratulated his colleagues on returning to work, saying that the process was corrupt and had been selective, completely discriminatory against him for ideological reasons, and that even if he had to eat dirt for the next few years, the true would prevail.

138. Mr. Perez then told the other suspended workers that they should go to the Arecibo regional office the next day, and as soon as they testified, they would get their medical insurance cards back and return to work.

139. In the early morning of August 22, 2013, Mr.Lasalle called Mr. Olivencia to tell him that he did not want to testify against Ms. Soto, and that he preferred a long suspension to having to testify against Nydia Soto.

25

140. Mr. Olivencia called Mr. Jerry Soto to ask if he had testified. Mr. Soto answered yes, but refused to answer anything else.

141. Mr. Lasalle then called Mr. Olivencia repeatedly to ask him to come and testify.

142. Mr. Olivencia called Mr. Hernandez's secretary and told her that he was ill. Mr. Olivencia sent a text to Mr. Perez, telling him the same thing. Mr. Perez responded with a text, saying that he recommended Mr. Olivencia to speak and to remember that he had been suspended.

143. The next day Mr. Olivencia texted Mr. Perez telling that he wanted to meet with him because he had exculpatory evidence. 4 days later Mr. Perez sent a text message that Mr. Olivencia should come and pick up his insurance cards.

144. On August 23, at 11:18am someone from Mr. Hernandez Perez's PREPA Office called Mr. Rivera and told him to pick up his medical insurance card. Mr. Rivera responded that he did not want to go to the PREPA office because he felt bad and Mr. Rivera ask the person if they could send to him or if his sister can pick up the medical insurance, and the person said no, emphatically.

145. On August 25, Mr. Rivera ran into Mr. Perez at a small grocery store.

146. On August 27, 2013, Mr. Rivera was feeling so distraught he went to see a psychiatrist. The psychiatrist recommended that due to his condition, Mr. Rivera not go to a meeting with UTIER's social worker.

147. The Collective Bargaining Agreement between UTIER and PREPA provides that the first time a PREPA employee is accused of repeated tardiness she may

26

receive a formal warning. The sanction for the second and third time an
employee is found to have been tardy repeatedly is also a formal warning.

148. Being absent from work without prior permission also warrants a formal
warning for a first offense; a second offense warrants a 40 hour suspension.

149. After a suspension, formal charges must be brought within five working days.

150. Mr. Rivera has never received formal charges, but remains suspended without
pay since August 21, 2013.

151. On September 6, 2013, both Mr. Olivencia and Mr. Rivera sent letters to Mr.
Oppenheimer requesting administrative hearings.

152. No hearing date has been set.

153. Mr. Rivera also sent letter to Mr. Jorge Hernandez Perez asking that his
medical plan be reinstated and asking why had been taken away. That letter
has not been answered.

154. On September 10,  2013, Mr. Oppenheimer visited the PREPA office in
Isabela and told the union workers who had signed the false sworn statements
that they had to repeat the false testimony in the injunction hearing due to be
held two days later.

155. On September 14, 2013, plaintiffs received letters from SSS telling that they
had not had medical insurance since August 21, 2013.

156. Mr. Olivencia's insurance coverage had switched back and forth as time
passed. On August 21, 2013 at the end of the informal hearing, Mr. Hernandez
Perez together with Mr. Perez Soler notified Mr. Olivencia that he had to return

27

his health plan card and that of his 6 year old son. Mr. Olivencia turned over

both insurance plan cards.  On August 30, 2013, Mr. Olivencia received a

PREPA certified letter from Mr. Hernandez Perez that said: after a consultation

(with Mr. Victor Oppenheimer) we are sending back your medical card of

Orlando Olivencia and your dependent Xavier Olivencia Morales. On

September 3, 2013, Mr. Olivencia received an SSS active certification from Ms.

Nayda G. Rivera Cruz, a SSS Manager. Ms. Rivera Cruz notified Mr. Olivencia

that his family plan was active.  On September 14, 2013, Mr. Olivencia received

a letter from the same person, Ms. Nayda G Rivera Cruz, but now telling Mr

Olivencia that his SSS family health plan was cancelled as of August 21, 2013.

157. On September 7, 2013, Oscar Roman, Victor Oppenheimer's nephew, told a

number of Mr. Rivera's neighborhood friends that Mr. Rivera had been

dismissed from PREPA for stealing time from PREPA by attending school

during working hours.

158. On September 14, 2013, Santiago Rodriguez, a PREPA supervisor, told Eddie

Ramirez, Mr. Rivera's uncle that Mr. Rivera was in big trouble because Mr.

Rivera's official vehicle had a GPS.

159. On September 16, 2013, Mr. Rivera and Mr. Olivencia went to SSS in

Mayaguez, where a Mr. Edwin Lamolli, a manager, told them that neither of

them had medical insurance, but that they would have to discuss the reasons

with PREPA because he did not know why.

160. On September 25, 2013. Mr. Rivera requested copies of his payroll records  in

28

the PREPA Isabela office from Carlos Arroyo. Mr. Arroyo told Mr. Rivera that he

had to ask for permission, and then that Mr. Jorge Hernandez Perez had denied

the permission at the instructions of Mr. Oppenheimer. Mr. Arroyo told Mr.

Rivera that to get copies he would have to go to the PREPA central office in

San Juan.

161. On October 1, 2013 Mr. Olivencia and Mr. Rivera went to the UTIER chapter

in Camuy to see their files and to ask for a copy of the letter that Mr. Perez

Soler had taken away from Mr. Rivera at his August 21 informal hearing. Mr.

Perez Soler gave instructions to his secretary, Ms. Aida Santiago that these two

union members were not to be allowed to see their files, unless their attorney

requested them from Alejandro Torres, Esq.

162. On October 2, 2013, the undersigned hand delivered a letter to Alejandro

Torres, Esq., UTIER's attorney. UTIER still has not turned over the files.

163. On October 4, 2013, Mr. Olivencia and Mr. Rivera visited the PREPA Arecibo

regional office in order to get a copy of their statement from their informal

hearings, as is their right according to the Collective Bargaining Agreement, and

Ivette Torres, Mr. Perez's secretary told them that everything was filed in San

Juan. Mr. Rivera answered that they wanted a copy of their statements. Ms.

Torres went to consult with Mr. Hernandez, then Ms. Anicet Ruiz took them into

an office and told them that they could not be at the PREPA offices. Ms. Ruiz

told them that they had to have an appointment to meet with Mr. Hernandez. Mr.

Olivencia told her that they did not want a meeting they just wanted a copy of

29

the minutes of their informal hearings and of their statements. Ms. Ruiz said she would have the documents by the end of the day, but at the end of the day she called to say that everything had to be requested by the undersigned to Mr. Oppenheimer.

164. On October 24, 2013, the new union delegate Alexander Soto called Mr. Rivera to tell him that there had been a hearing scheduled about Mr. Rivera's medical plan, but that the hearing had been postponed. Mr. Rivera told Mr. Soto that he did not want Mr. Perez Soler handling his case when it had been Mr. Perez who had had everyone turn in their insurance cards. Mr. Soto then tried to convince Mr. Rivera that he should dismiss Jane Becker Whitaker, undersigned counsel, from representing him in any of these matters.

165. The Collective Bargaining Agreement requires that formal charges must be presented within five working days of a suspension without pay.

166. Both Mr. Rivera and Mr. Olivencia have requested formal hearings, but no hearing officer has been assigned.

167. Both Mr. Rivera and Mr.Olivencia have informed UTIER that they want the undersigned to represent them at their formal hearings.

**FIRST CLAIM FOR RELIEF**
**(SECTION 1983 VIOLATION OF THE FIVE AND FOURTEENTH AMENDMENTS)**

168. Plaintiffs incorporate as if re-alleged the preceding paragraphs with the same force and effect as if herein set forth.

169. Because Defendants failed to afford Mr. Rivera due process of law by notifying him of the nature of the charges on which PREPA based his summary suspension,

30

they violated 42 U.S.C. 1983 with knowing and reckless disregard of said Act's proscriptions.

170. Because Mr. Perez Soler, in conspiracy with the other defendants refused to consider the exculpatory evidence of either Mr. Oliencia or Mr. Rivera before their informal hearings, they conspired to and in fact denied Mr. Olivencia and Mr. Rivera due process.

171. Defendants summarily suspended Mr. Rivera and Mr. Olivencia without due process.

172. Defendants engaged in policies and practices which willfully, or in the alternative unwillfully, discriminated against the plaintiffs by not affording him due process.

173. Mr. Rivera and Mr. Olivencia have a property interest in their continued employment of which they cannot be deprived without due process.

174 As a result of the before mentioned, Mr. Rivera and Mr. Olivencia is each entitled to be paid by defendants the following damages: punitive, emotional, and economic damages of not less than the sum of $500,000.00, plus interest and any other benefits allowed by law.

175. All of the previously mentioned acts of the defendants violated 42 U.S.C. 1983, and the other federal laws previously cited.

176.   Mr. Rivera and Mr. Olivencia seek immediate reinstatement.

### SECOND CLAIM FOR RELIEF
### PUERTO RICO CONSTITUTIONAL DUE PROCESS PUERTO RICO ARTICLE II, SECTION 7

177. Plaintiffs incorporate as if re-alleged the preceding paragraphs with the same

31

force and effect as if herein set forth.

178. Defendants by the acts previously described in this Complaint, violated the Constitution of Puerto Rico which prohibits the deprivation of property without due process of law. Mr. Rivera and Mr. Olivencia seek immediate reinstatement.

179. Defendants' discrimination has harmed plaintiffs emotionally and economically. The amount of damages exceeds $500,000.00 each.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**(VIOLATION OF THE FIRST AMENDMENT)**

180. Plaintiffs incorporate as if re-alleged the preceding paragraphs with the same force and effect as if herein set forth.

181. Defendants by the acts previous described in this Complaint, violated Mr. Oliviencia's right under the First Amendment to refrain from providing false testimony.

182. Defendants also violated the rights of Mr. Olivencia and Mr. Rivera to associate with whomever they desire based on their political affiliation and to assert their support for statehood without fear of losing their jobs as has happened here.

183. Defendants' discrimination has harmed plaintiffs economically and emotionally, and plaintiffs are entitled to punitive damages for defendants' conspiracy to violate the United States Constitution. The amount of damages exceeds $1,000,000.00.

**FOURTH CLAIM FOR RELIEF**
**PUERTO RICO CONSTITUTION ARTICLE II, SECTION 8**
**PROTECTION AGAINST ATTACKS TO A PERSON'S HONOR, REPUTATION, AND**
**FAMILY LIFE**

184. Plaintiffs incorporate as if re-alleged the preceding paragraphs with the same force and effect as if herein set forth.

32

185. Defendants by the acts previously described in this Complaint, violated the Constitution of Puerto Rico, Article II, Section 8, which requires that all persons have a right to legal protection against abusive attacks against their honor, reputation and family life.

186. Defendants' aggressive attack on plaintiffs' honor, reputation and family life has harmed each plaintiff economically and emotionally. The amount of damages exceeds $500,000.00.

## FIFTH CLAIM FOR RELIEF
### ARTICLES 1802, 1803 PUERTO RICO CIVIL CODE
### (Mental and Moral Damages)

187. Plaintiffs incorporate as if re-alleged the preceding paragraphs with the same force and effect as if herein set forth.

188. As a result of the before mentioned acts and omissions, the defendants have directly and intentionally inflicted emotional distress, humiliation, harassment, and mental anguish on the plaintiffs, in an amount in excess of $500,000.00. Ms. Mendez intentionally defamed plaintiffs by saying they had stolen time from PREPA, with the knowledge that her statements were false and with the intention of harming plaintiffs. The plaintiffs haves suffered immensely because of the illegal activities of defendants and are desperate, depressed, and anxious. They have  spent endless nights and days of worry, uncertainty and despair. Their  severe mental depression and emotional distress has caused severe problems in their lives.

## SIXTH CLAIM FOR RELIEF
### PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

189. Plaintiffs incorporate as if re-alleged the preceding paragraphs with the same

force and effect as if herein set forth.

190. Plaintiffs are suffering irreparable harm each day they are unemployed due to defendants' unconstitutional actions.

191. The likelihood of success on the merits in this case is high because defendants lack any evidence that plaintiffs violated any of PREPA's, much less a rule which would cause harm to the Treasury of Puerto Rico or imminent harm to any person.

192. The balance of the equities favors plaintiffs because defendants have no evidence that they violated any rule because they did not do so and instead worked efficiently and effectively for PREPA

193. The public interest would be served by granting a preliminary injunction allowing plaintiffs to return to work 193/ This Court should also  order PREPA remove all record of these accusations from plaintiffs'  personnel file and to issue a public apology for the dismissals and Ms. Mendez's defamation.

**TRIAL BY JURY**

194. Plaintiffs demand trial by jury.

WHEREFORE, in view of the foregoing, plaintiff respectfully requests that judgment be entered against the defendants jointly and severally, as follows:

a) Ordering PREPA  to reinstate plaintiffs immediately and the other defendant to pay plaintiffs a sum in excess of $500,000.00 plus interest as per the First Claim for Relief (Section 1983, deprivation of property without due process of law);

b) Ordering the defendants to reinstate plaintiffs immediately a pay each plaintiff a sum in excess of $500,000.00, plus interest as per the Second Claim for Relief (Due

34

Process Pursuant to the Puerto Rico Constitution);

c) Ordering defendants to reinstate each plaintiff and pay him a sum in excess of $1,000,000.00 as per the Third Claim for Relief (Violation of the First Amendment);

d) Ordering defendants to reinstate plaintiff and pay each plaintiff the sum of $500,000 as per the Fourth Claim for Relief (Attacks on honor, family, and reputation)

e) Ordering defendants to pay plaintiff the sum of $500,000 as per the Fifth Claim for Relief (Articles 1802,1803 of the Puerto Rico Civil Code)

f) Ordering defendants to reinstate each plaintiff providing him with full employment benefits and salary as if the summary suspension had not occurred as per the Sixth Cause of Action.

g) Ordering defendants to cease and desist from any further discriminatory conduct;

h) Ordering the defendants in the respective causes of action to pay interests, costs, and attorney's fees, pursuant to 42 USCA §2002-5(k); and,

i)      Granting such other and further relief as may be just and proper.

RESPECTFULLY SUBMITTED.

In San Juan, Puerto Rico this  6th day of November 2013.


LAW OFFICES OF
JANE BECKER WHITAKER
/s/Jane Becker Whitaker
P.O. Box 9023914
San Juan, PR 00902-3914
Tel. (787) 754-9191
Fax (787) 764-3101
JANE BECKER WHITAKER
USDCPR Bar Number 205110

## UNSWORN STATEMENTS UNDER PENALTY OF PERJURY

I, Jose Marcelo Rivera Ramirez, of legal age, single, and resident of San Sebastian, a Meter Reader Tester state under penalty of perjury that the facts in the above Complaint are true.


_____
Jose Marcelo Rivera Ramirez


I, Orlando Olivencia de Jesus, of legal age, single, and resident of Arecibo, Puerto Rico, General Office Clerk in customer service state under penalty of perjury that the facts in the above Complaint are true.




_____
Orlando Olivencia de Jesus




36